**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| DORA SAUCEDO, | No. CV 05-6966-PLA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on September 27, 2005, seeking review of the Commissioner's denial of her applications for Supplemental Security Income payments and Disability Insurance Benefits.  The parties filed a Consent to proceed before the undersigned Magistrate Judge on October 7, 2005.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on May 26, 2006, that addresses their positions concerning the disputed issues in the case.   The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on July 15, 1961. [Administrative Record ("AR") at 59, 528.] She has a fifth grade education and past work experience as a sales clerk. [AR at 15, 80, 83-84.]

On September 30, 2002, plaintiff protectively filed her current applications for Supplemental Security Income payments and Disability Insurance Benefits, alleging that she has been unable to work since February 20, 2001, due pain in the legs, lower back, neck, shoulders, and hands.[1] She also alleged depression. [AR at 15, 59, 74, 116, 121, 528, 545, 547-51.] After a denial of her applications at the initial level, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 36-40.] The hearing was held on January 9, 2004, at which time plaintiff appeared with counsel and testified on her own behalf.  A vocational expert ("VE") also testified.  [AR at 536-58.] On June 1, 2004, the ALJ determined that plaintiff was not disabled. [AR at 14-19.] When the Appeals Council denied review on July 21, 2005, the ALJ's decision became the final decision of the Commissioner. [AR at 6-9.]

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's

---

[1]   Although the Disability Insurance Benefits application indicates that plaintiff has been disabled since February 15, 2001, the Supplemental Security Income application and Disability Report note that plaintiff has been disabled since February 20, 2001. [AR 59, 74, 528.]

1   decision, the Court examines the administrative record as a whole, considering adverse as well

2   as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th

3   Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court

4   must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala,

5   53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

6

7                                               IV.

8                        **THE EVALUATION OF DISABILITY**

9            Persons are "disabled" for purposes of receiving Social Security benefits if they are unable

10   to engage in any substantial gainful activity owing to a physical or mental impairment that is

11   expected to result in death or which has lasted or is expected to last for a continuous period of at

12   least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

13

14   **A.      THE FIVE-STEP EVALUATION PROCESS**

15           The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

16   whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

17   828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must

18   determine whether the claimant is currently engaged in substantial gainful activity; if so, the

19   claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

20   substantial gainful activity, the second step requires the Commissioner to determine whether the

21   claimant has a "severe" impairment or combination of impairments significantly limiting her ability

22   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

23   If the claimant has a "severe" impairment or combination of impairments, the third step requires

24   the Commissioner to determine whether the impairment or combination of impairments meets or

25   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,

26   Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.

27   If the claimant's impairment or combination of impairments does not meet or equal an impairment

28   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

1  sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled

2  and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform

3  past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

4  case of disability is established.  The Commissioner then bears the burden of establishing that the

5  claimant is not disabled, because she can perform other substantial gainful work available in the

6  national economy.   The determination of this issue comprises the fifth and final step in the

7  sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d

8  at 1257.

9

10  **B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

11        In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial

12  gainful activity since the alleged onset date of the disability.[2] [AR at 19.] At step two, the ALJ

13  concluded that plaintiff had "a 'severe' impairment."[3] [Id.] At step three, the ALJ determined that

14  plaintiff's impairment did not meet or equal any impairment in the Listing. [Id.] The ALJ further

15  determined that plaintiff retained the residual functional capacity ("RFC")[4] to perform a full range

16  of medium exertional work but could not be exposed to high stress. [Id.] At step four, the ALJ

17  concluded that plaintiff was capable of performing her past relevant work as a sales clerk. [Id.]

18  Accordingly, the ALJ determined that plaintiff was not disabled. [Id.]

19  /

20  /

21  /

22  /

23

24        [2]    The ALJ determined that plaintiff met the nondisability requirements for a period of disability
25  and Disability Insurance Benefits, and was insured through the date of the hearing decision. [AR
    at 18.]
26
        [3]    The ALJ failed to expressly list the impairment(s) he found to be severe. [AR at 19.]
27
        [4]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.
28  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1

**V.**

2

**THE ALJ'S DECISION**

3       Plaintiff contends that the ALJ: (1) failed to provide plaintiff a full and fair hearing; (2) failed

4   to give appropriate weight to the treating and examining physicians; (3) failed to properly evaluate

5   plaintiff's severe impairments; (4) failed to properly determine plaintiff's RFC; (5) erred in finding

6   that plaintiff could return to her past relevant work; and (6) failed to properly evaluate plaintiff's

7   subjective complaints.  Joint Stipulation ("Joint Stip.") at 2.  The Court agrees that the ALJ failed

8   to properly evaluate plaintiff's subjective complaints, and remands the matter for further

9   proceedings.[5]  For the sake of clarity, plaintiff's claims will be addressed in a different order than

10  as presented in the Joint Stipulation.

11

12  **A.      THE TREATING PHYSICIANS' OPINIONS**

13      In evaluating medical opinions, the case law and regulations distinguish among three types

14  of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but

15  do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

16  claimant (non-examining physicians).  See 20 C.F.R. §§ 404.1502, 416.927; Lester, 81 F.3d at

17  830.  Generally, the opinions of treating physicians are given greater weight than those of other

18  physicians, because treating physicians are employed to cure and therefore have a greater

19  opportunity to know and observe the claimant.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir.

20  1996); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (citing Sprague v. Bowen, 812

21  F.2d 1226, 1230 (9th Cir. 1987)).  Although the treating physician's opinion is entitled to great

22  deference, it is not necessarily conclusive as to the question of disability.  Magallanes, 881 F.2d

23  at 751 (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989)).  Where the treating

24  physician's opinion is uncontradicted, it may be rejected only for "clear and convincing" reasons.

25  ───────────────────

26      [5]    The results of the determination of Issue No. 6 on remand may impact Issues No. 4 and
    No. 5; therefore, Issues No. 4 and No. 5 will not be addressed at this time.  In Issue No. 3, plaintiff
27  contends that the ALJ failed to identify with specificity which impairments he found to be "severe."
    Joint Stip. at 19.  On remand, the ALJ shall expressly identify the impairments that are determined
28  to be "severe."

1    Lester, 81 F.3d at 830.  Where the treating physician's opinion is contradicted, the ALJ may reject

2    it in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth

3    specific, legitimate reasons for doing so that are based on substantial evidence in the record.

4    Ramirez v. Shalala, 8 F.3d 1449, 1453-54 (9th Cir. 1993).  To meet this standard, the ALJ need

5    not discuss all of the evidence presented but must explain why he rejected "significant probative

6    evidence."  Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (citing Cotter v. Harris, 642

7    F.2d 700, 706 (3rd Cir. 1981)).

8         Plaintiff contends that the ALJ failed to provide legally sufficient reasons for rejecting the

9    opinion of the treating physicians.  Joint Stip. at 15. As set forth below, the Court agrees with

10   plaintiff, but does not order remand on this issue.

11

12        **1.    Treating Orthopedist's Opinion**

13        Dr. Francis D'Ambrosio, an orthopedist, treated plaintiff from February 20, 2001, through

14   November 12, 2002. [AR at 223-64, 302-44, 439-41.] He treated plaintiff for complaints of pain in

15   the cervical spine, lumbar spine, shoulders, wrists, and elbows. [Id.] At the initial evaluation

16   conducted on February 20, 2001, a physical examination of the cervical spine revealed, among

17   other things, tenderness to palpation of the paraspinal musculature and the presence of muscle

18   spasm and torticollis, and decreased range of motion.  [AR at 260.]  The examination of the

19   lumbar spine also revealed tenderness to palpation of the paraspinal musculature and the

20   presence of muscle spasm, and decreased range of motion. [AR at 260-61.]

21        In his examination of plaintiff's upper extremities, Dr. D'Ambrosio found that there was

22   tenderness over the anterolateral aspect of the bilateral acromial process, which was more severe

23   on the right than on the left. [AR at 261.] He observed that plaintiff had decreased range of motion

24   of both shoulders with painful flexion, abduction, internal rotation, and external rotation. [Id.]

25   Plaintiff was also found to have discrete tenderness over the lateral epicondyle of the right elbow,

26   which was exacerbated when the wrist was taken from the position of full extension and placed

27   into passive flexion. [Id.] In addition, the examination of the wrists revealed tenderness over the

28   dorsal aspect of both wrists with painful flexion. [Id.]

In the lower extremities, Dr. D'Ambrosio found that plaintiff had pain with the extremes of flexion, abduction, and internal rotation of the bilateral hips, with tenderness over the greater trochanter, bilaterally. [AR at 262.] In addition, the examination of plaintiff's knees showed positive patellofemoral compression test in both knees, with tenderness over the medial joint line on the right knee and lateral joint line on the left knee. [Id.] Dr. D'Ambrosio diagnosed plaintiff with cervical spine musculoligamentous injury; lumbar strain; bilateral shoulder impingement syndrome; bilateral elbow, wrist, hip, and knee strain; and stress and anxiety. [AR at 263-64.]

Dr. D'Ambrosio found plaintiff totally and temporarily disabled for continuous six week periods beginning from February 20, 2001, until September 6, 2002, at which time he found plaintiff to be permanently disabled.[6] [AR at 223-64, 305-44, 439-41.] In his permanent and stationary orthopedic evaluation, Dr. D'Ambrosio noted plaintiff's continuing complaints of pain in her cervical spine, lumbar spine, and right shoulder. [AR 307-08.] His examination again revealed tenderness to palpation, muscle spasm, decreased range of motion, positive impingement sign, and decreased sensation at various spots. [AR at 309-11.]

Along with the observations from the physical examination, Dr. D'Ambrosio also noted abnormal findings from MRI scans and an electro-neurodiagnostic examination. [AR at 312.] Specifically, an MRI of the right shoulder, taken on February 27, 2001, found that plaintiff had tendinitis in the right shoulder with mild to moderate impingement. [AR at 188.] In addition, a September 5, 2001, MRI study of the cervical spine showed a 1 to 2 mm posterior disc protrusion at the C3-4 level, and a 2 mm posterior disc protrusion at the C5-6 level. [AR at 189.] An MRI of the lumbar spine, also taken on September 5, 2001, revealed a 2 mm posterior disc protrusion at the L3-4 level, and a 2 to 3 mm posterior disc protrusion at the L4-5 level, with both levels showing bilateral hypertrophic facet changes. [AR at 190-91.] The finding from an electro-neurodiagnostic examination performed on May 4, 2002, was consistent with left S1 radiculopathy. [AR at 353.]

---

[6]   Although Dr. D'Ambrosio opined to temporary and total disability for periods of mostly six weeks, on June 26, 2001, he found plaintiff to be temporarily and totally disabled for three weeks. [AR at 244-46.] However, by the end of the third week, Dr. D'Ambrosio examined plaintiff and found her to be temporarily and totally disabled for six weeks. [AR at 240-42.]

Dr. D'Ambrosio diagnosed plaintiff with cervical spine musculoligamentous injury with radiculopathy, lumbar spine musculoligamentous injury with radiculopathy, right shoulder impingement syndrome, fibromyalgia, and psychiatric decompensation. [AR at 311-12.] He opined to the following work restrictions: preclusion from heavy work, which contemplates the loss of approximately 50% of plaintiff's pre-injury capacity for performing activities such as lifting, bending, stooping, pushing, pulling, and climbing, or other activities of comparable physical effort; preclusion from repetitive motions of the neck, which contemplates the loss of approximately 50% of plaintiff's pre-injury capacity for flexing, extending, bending, and rotating of the neck; preclusion from forceful activities with the right upper extremity, which contemplates the loss of 50% of plaintiff's pre-injury capacity for performing activities such as lifting, pushing, pulling, reaching, holding, and torquing, or other activities of comparable physical effort; and preclusion from at or above shoulder level use of the right upper extremity. [AR at 314.]

Dr. D'Ambrosio's opinion was contradicted by that of Dr. Anh-Tat Hoang, an orthopedic consultative examiner, who evaluated plaintiff on December 5, 2002. [AR at 135-41.] Dr. Hoang observed that plaintiff's station and gait were normal. [AR at 137.] The examination of the cervical spine, thoracic spine, lumbosacral spine, bilateral shoulders, bilateral elbows, bilateral wrists, bilateral hands, bilateral hips, bilateral knees, and bilateral ankles/feet were all unremarkable. [AR at 137-39.] The neurologic examination also returned normal. [AR at 140.] Dr. Hoang commented that there was normal appearance of the affected joints, without signs of inflammation of the major joints of the body. [Id.] He opined that plaintiff had the capacity to: lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk for 8 hours in an 8-hour workday; and sit for an unlimited time period. [Id.]

On December 26, 2002, a nonexamining state agency physician completed a Physical Residual Functional Capacity Assessment form. [AR at 147-53.] The state agency physician largely concurred with Dr. Hoang's opinion, finding plaintiff to be able to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. [AR at 148.]

In rejecting Dr. D'Ambrosio's opinion, the ALJ reasoned that plaintiff "seemed to be evaluated by the doctor on a monthly basis, although there is absolutely no mention as to any sort of examination or tests run." [AR at 16.] The ALJ added that "[e]xcept for the initial evaluation, the doctor wrote the same results at every visit during this ten[-]month period without change." [Id.] It also appears that the ALJ rejected Dr. D'Ambrosio's findings because he was plaintiff's worker's compensation physician, who was "retained on a lien-fee basis, making [his] opinion[] suspect."[7] [AR at 18.]

The ALJ's reasons for rejecting the treating physician's opinion were not legal sufficient. First, contrary to the ALJ's contention that Dr. D'Ambrosio's evaluations were not supported by examinations or tests, Dr. D'Ambrosio conducted numerous physical examinations during the course of treatment (over approximately 19 sessions) and assessed the results from MRIs, x-rays, and electro-neurodiagnostic examinations. [AR 223-64, 305-44, 348-58, 439-41.] In particular, as noted above, Dr. D'Ambrosio's September 6, 2002, report contained the results of a comprehensive examination. [AR at 305-16.] The objective findings included: decreased range of motion of the cervical spine, lumber spine, and right shoulder; palpable muscle spasm and tenderness to palpation; decreased sensation; electro-neurodiagnostic examination suggesting left S1 radiculopathy; MRIs of the cervical spine and lumbar spine showing posterior disc protrusions; and an MRI of the right shoulder evidencing tendinitis with mild to moderate impingement. [AR at 308-11, 313-14.] These results led to Dr. D'Ambrosio's opinion of the aforementioned work restrictions. [AR at 314.] Thus, the ALJ's determination that Dr. D'Ambrosio's evaluations were not supported by examinations or tests was in error, and did not constitute a legitimate reason for the rejection of his opinion.

---

[7]    The ALJ appears to be rejecting all of the treating physicians, who were tied to plaintiff's worker's compensation claim, by stating the following:

> [Plaintiff's] worker's compensation treatment starts up again but with a whole new list of players. The doctors are all retained on a lien-fee basis, making their opinions suspect. [Plaintiff] seemed to improve twice, according to the record, and then inexplicitly retain[ed] new physicians that placed her status as disabled. Even though no new studies, diagnostics, etc. were taken to support their diagnos[e]s.

[AR at 18.]

1    In addition, the ALJ's finding that, except for the initial evaluation, Dr. D'Ambrosio wrote "the

2    same results at every visit during this ten[-]month period without change," was not a legally

3    sufficient reason for rejection. [AR at 16.] Although on six occasions Dr. D'Ambrosio reported that

4    the results of the physical examination administered during the particular session remained

5    unchanged from the prior examination, on the other thirteen occasions Dr. D'Ambrosio stated the

6    specific findings of examinations, with varying results.  For example, on April 8, 2002, and June

7    14, 2002, Dr. D'Ambrosio noted that plaintiff had decreased sensation along the C5 dermatome

8    and S1 dermatome. [AR at 321-23, 334-36.] However, on July 9, 2002, plaintiff was found to have

9    normal sensation in the upper extremities, albeit decreased sensation along the S1 dermatome

10    was present. [AR 324-27.] On other occasions, sensation along the C5 dermatome or S1

11    dermatome was not tested for or reported.  [AR at 240-42, 247-49, 317-19, 329-32, 343-44.]

12    Moreover, the ALJ's implication that the similar results from the treatment sessions indicate

13    that Dr. D'Ambrosio may have fabricated the results was not supported by the record.  Rather, to

14    the extent that the results of the physical examinations were similar, the consistency only bolstered

15    Dr. D'Ambrosio's opinion that plaintiff had limitations that did not improve over time.  The ALJ's

16    reason was not legally sufficient for rejecting Dr. D'Ambrosio's opinion.

17    Finally, the ALJ improperly rejected Dr. D'Ambrosio's assessments because he was

18    plaintiff's worker's compensation physician, who was "retained on a lien-fee basis." [AR at 18.] As

19    D'Ambrosio provided some medical bases for his opinion, the ALJ could have rejected Dr.

20    D'Ambrosio's findings based on his professional relationship with plaintiff only by showing

21    evidence of actual impropriety. See Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (the

22    source of report is a factor that justifies rejection only if there is evidence of actual impropriety or

23    no medical basis for opinion) (citing Saelee v. Chater, 94 F.3d 520, 523 (9th Cir. 1996), cert.

24    denied, 519 U.S. 1113 (1997)).  The record contains no evidence that Dr. D'Ambrosio embellished

25    his assessments of plaintiff's limitations in order to assist her with her benefits claim.  Accordingly,

26    this suggestion fails to constitute a specific, legitimate reason for rejection.[8]  See Reddick v.

27

28    [8]    Plaintiff briefly argues that the ALJ should have given consideration to the opinion of Dr. Raymond Phillips, plaintiff's treating chiropractor. Joint Stip. at 13-14.  In particular, on October

1   Chater, 157 F.3d 715, 725-26 (9th Cir. 1998) (holding that the ALJ erred in assuming that the

2   treating physician's opinion was less credible, because his job was to be supportive of the patient).

3         Nevertheless, although the ALJ erred in his reasons for discounting Dr. D'Ambrosio's

4   opinion, the error was harmless.  At the January 9, 2004, hearing, the ALJ proffered a hypothetical

5   question that included the limitations found by the ALJ. [AR at 553-54.] The vocational expert

6   testified that the hypothetical individual could perform plaintiff's past relevant work as a sales clerk.

7   [AR at 554.] Thereafter, the ALJ proposed a second hypothetical question that included the

8   limitations found by Dr. D'Ambrosio. [AR at 554-55.] The vocational expert responded by asserting

9   that, although the individual could not perform plaintiff's past relevant work, the individual could

10   perform other work at the light exertional level, such as that of a flagger.[9] [AR 555.] Therefore,

11

12   20, 2003, Dr. Phillips completed a Physical Residual Functional Capacity Questionnaire in which

13   he opined that plaintiff could walk for 2 blocks without rest or severe pain; could continuously sit

14   for 1 hour for a total of at least 6 hours in an 8-hour workday; could continuously stand for 45
minutes for a total of less than 2 hours in an 8-hour workday; required the option to walk around

15   every hour for 5 minutes in an 8-hour workday; required the option to shift positions at will from
sitting, standing, or walking; required the option to take unscheduled 5 minute breaks once every

16   2 hours; could lift and carry less than 10 pounds frequently and 10 to 20 pounds occasionally;
could grasp, turn, and twist objects for 2 hours in an 8-hour workday; could perform fine

17   manipulations for 6 hours in an 8-hour workday; could reach for 2 hours in an 8-hour workday;
could stoop for 10% of an 8-hour workday; could crouch for 20% of an 8-hour workday; and would

18   have "good days" and "bad days" and be absent from work about once a month. [AR at 462-64.]

19       Plaintiff correctly notes that a chiropractor is considered an "other source."  Joint Stip. at
14; 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  As Dr. Phillips was deemed an "other source,"

20   the ALJ could have accorded his opinion "less weight than opinions from acceptable medical
sources."  See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir.), cert. denied, 519 U.S. 881

21   (1996); 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5).  As this case will be remanded on
another ground, the ALJ should give proper consideration to Dr. Phillips' opinion. Specifically, the

22   ALJ may discount the testimony of an "other source" only if he gives "reasons that are germane
to each witness."  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

23

24     9    The ALJ proffered a hypothetical that contained the limitations found by Dr. D'Ambrosio,
including: preclusion from heavy work, which contemplates the loss of approximately 50% of

25   plaintiff's pre-injury capacity for performing activities such as lifting, bending, stooping, pushing,
pulling, and climbing, or other activities of comparable physical effort; preclusion from repetitive

26   motions of the neck, which contemplates the loss of approximately 50% of plaintiff's pre-injury
capacity for flexing, extending, bending, and rotating of the neck; and preclusion from forceful

27   activities with the right upper extremity, which contemplates the loss of 50% of plaintiff's pre-injury
capacity for performing activities such as lifting, pushing, pulling, reaching, holding, and torquing,

28   or other activities of comparable physical effort. [AR at 314, 554-55.] However, the ALJ failed to

1  plaintiff would have been found not disabled notwithstanding the ALJ's rejection of the findings

2  from Dr. D'Ambrosio.  Because the outcome would have been the same, any error was harmless.

3  See Curry, 925 F.2d at 1131; Booz, 734 F.2d at 1380-81.  See also Shramek v. Apfel, 226 F.3d

4  809, 814-15 (7th Cir. 2000) (even though the ALJ improperly discounted the opinion of the treating

5  physician, the error was harmless as the hypothetical submitted to the VE included all of the

6  functional limitations set forth by that physician, the VE identified a number of employment

7  positions falling within those parameters, and the VE's conclusion was not challenged by the

8  plaintiff).

9        Accordingly, plaintiff's contention that the ALJ erred in discounting the treating physician's

10  opinion is rejected.

11

12        **2.      Treating Psychologist's Opinion**

13        Dr. Dabney Blankenship was plaintiff's treating psychologist from February 21, 2002,

14  through July 2, 2002. [AR at 364-418.] On February 21, 2002, Dr. Blankenship performed an initial

15  evaluation, in which he noted plaintiff's complaints of tension, sleeplessness, insecurity, and

16  severe depression, all arising out of her physical pain. [AR at 393-94.] He administered a mental

17  status examination and a series of psychological tests.

18        The mental status examination was unremarkable except for the observations of low activity

19  level and mental and physical fatigue. [AR at 395-96.] However, Dr. Blankenship noted that the

20  psychological testing results supported plaintiff's reported symptoms. [AR at 397.] Specifically, the

21  tests revealed that plaintiff had above-average Pain Patient depression, anxiety, and somatization

22  scores[10] [AR at 397-99]; that plaintiff's employment aspirations and desire for personal

23

24  include Dr. D'Ambrosio's finding that plaintiff was precluded from at or above shoulder level use
    of the right upper extremity. [AR at 314.] Nevertheless, the VE testified that the work of a flagger

25  could be performed with one arm and therefore, the ALJ's failure to include the particular limitation
    was harmless error. [AR at 555]; see Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)

26  (harmless error rule applies to review of administrative decisions regarding disability); Booz v.
    Secretary of Health & Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984) (same).

27

28        [10]    Dr. Blankenship noted that there was a significant relationship found between plaintiff's
    degree of anxiety and depression and her physical and somatic complaints. [AR at 309.] He further

1   accomplishments were lower than the normal level [AR at 399-400]; that plaintiff had a high

2   degree of depression that was most likely impairing her level of functioning and her ability to

3   perform her usual activities and responsibilities of daily living [AR at 400-03]; that she was feeling

4   helpless, pessimistic, anxious, hopeless, and fearful, and that she internalized anger [AR at 403-

5   04]; and that plaintiff had moderate pain but was poor at coping with her impairments. [Id.]

6        Dr. Blankenship diagnosed plaintiff with mood disorder, due to a general medical condition,

7   and assessed a Global Assessment of Functioning ("GAF") score of 55.[11] [AR at 411-12.] He

8   concluded that plaintiff's symptoms had seriously interfered with most, but not all, major life and

9   personal functions. [AR at 414.] Dr. Blankenship also found that, due to constant tension and

10  anxiety associated with her physical ailments, plaintiff had trouble concentrating on a given task

11  and her functioning was impaired. [Id.]

12       After several treatment sessions, Dr. Blankenship completed a permanent and stationary

13  evaluation on July 2, 2002. [AR at 364-88.] In the report, Dr. Blankenship again reported the

14  findings of a mental status examination and a series of psychological tests. [AR at 368-81.] Similar

15  to the mental status examination performed on February 21, 2002, the results were unremarkable

16  except for the observation of low activity level. [AR at 371-72.] However, in the July mental

17  examination, Dr. Blankenship noted that plaintiff did not display mental or physical fatigue. [AR at

18  371.]

19       Additionally, Dr. Blankenship found that the psychological testing results supported

20  plaintiff's reported symptoms and were consistent with her presentation. [AR at 370, 372.] He

23  commented that this may impact how receptive plaintiff is to treatment due to preoccupation with
    physical ailments. [Id.] He opined that this condition could render plaintiff with possible
24  "impermeability of treatment interventions." [Id.]

25  [11]   A GAF score is the clinician's judgment of the individual's overall level of functioning.  It is
    rated with respect only to psychological, social, and occupational functioning, without regard to
26  impairments in functioning due to physical or environmental limitations.  See American Psychiatric
    Association, Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 2000)
27  (hereinafter "DSM IV"). A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and
    circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational,
28  or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV, at 34.

1    concluded that the results revealed limited changes with regard to the acuity of plaintiff's level of

2    anxiety, depression, and frustration. [AR at 382.] He also noted that these symptoms affected

3    plaintiff's level of functioning as well as her ability to perform her usual activities and

4    responsibilities of daily living. [Id.] Furthermore, Dr. Blankenship found that plaintiff continued to

5    experience a moderate to high degree of stress because she could not return to her occupation.

6    [AR at 382-83.] As a result, plaintiff encountered periods of frustration and anxiety. [AR at 383.]

7    Moreover, Dr. Blankenship observed that plaintiff had significant difficulties in finding adequate

8    ways to relax and relieve her anxiety and depression. [Id.]

9          Dr. Blankenship diagnosed plaintiff with major depressive disorder, single episode,

10   moderate, and assessed a GAF score of 60.[12] He opined that plaintiff's ability to: comprehend and

11   follow instructions was slightly impaired; perform simple and repetitive tasks was slightly impaired;

12   maintain a work pace appropriate for a given work load was slightly to moderately impaired;

13   perform complex or varied tasks was moderately impaired; relate to others beyond giving and

14   receiving instructions was slightly to moderately impaired; influence people was slightly impaired;

15   make generalizations, evaluations, or decisions without immediate supervisors was moderately

16   impaired; and accept and carry out responsibilities for directions, control, and planning was slightly

17   to moderately impaired. [AR at 385.]

18         These findings were contradicted by the opinion of Dr. Ernest Bagner, a consultative

19   examiner.  On December 18, 2002, Dr. Bagner performed a complete psychiatric examination, in

20   which he noted plaintiff's complaints of depression, crying spells, anxiety, helplessness,

21   hopelessness, difficulty concentrating, and panic attacks. [AR at 143-46.] Dr. Bagner performed

22   a mental status examination which was unremarkable except that plaintiff's memory and

23

24        [12]  Dr. Blankenship confusingly stated that plaintiff had major depressive disorder, single
25   episode, mild, in a section of his report, and then noted that plaintiff had major depressive
     disorder, single episode, moderate, in another section. [AR at 381, 384.] Taking into consideration
26   his GAF assessment and work limitation findings, it appears that Dr. Blankenship was most likely
     of the opinion that plaintiff's major depressive disorder was moderate. [AR at 381, 385.] Indeed,
27   the diagnostic code he utilized in his "supporting data" section -- DSM IV: 296.22 -- indicates it is
     of moderate severity.  See DSM-IV, at 370 (the number 2 in the fifth digit of the code indicates
28   moderate severity).

concentration were slightly impaired. [AR at 144-45.] He diagnosed plaintiff with depressive disorder, not otherwise specified, and assessed her GAF score at 76.[13] [AR at 145.] Dr. Bagner opined that plaintiff would have no limitations interacting with supervisors, peers, or the public; completing simple tasks; or completing a normal workweek without interruptions. [Id.] He further found that plaintiff would have zero to mild limitations handling normal stresses at work, maintaining concentration and attention, and completing complex tasks. [Id.]

In rejecting Dr. Blankenship's opinion, the ALJ noted that Dr. Blankenship "diagnosed [plaintiff] with a generalized mood disorder and a [GAF] of 55, even though [plaintiff] scored remarkably well during the mental status evaluation."[14] [AR at 17.] This did not constitute a specific and legitimate reason for rejection.

Although the ALJ properly noted that the mental status examination administered by Dr. Blankenship did not support his opinion of moderate mental limitations, the ALJ failed to consider the results of the multiple psychological tests.[15] [AR at 368-70, 372-81, 397-411.] More importantly, Dr. Blankenship discussed how the results of the psychological tests supported plaintiff's reported symptoms and were consistent with her presentation. [AR at 370, 372.] He noted that the psychological tests revealed that plaintiff continued to experience a moderate to high degree of stress because she could not return to her occupation, and as a result, she encountered periods of frustration and anxiety. [AR at 382-83.] Dr. Blankenship further determined that these symptoms affected plaintiff's level of functioning as well as her ability to perform her

---

[13]   A GAF score of 71-80 denotes that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument)." DSM IV, at 34. It also indicates "no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Id.

[14]   In addition, as noted above, the ALJ appears to be rejecting the opinions of all of the physicians related to plaintiff's worker's compensation claim, including the findings of Dr. Blankenship, because they were retained on a lien-fee basis. [AR at 18.] As discussed in the previous section, this was not a proper basis for rejection. See Nguyen, 100 F.3d at 1465 (citing Saelee, 94 F.3d at 523).

[15]   Medically acceptable laboratory findings include psychological test results. 20 C.F.R. §§ 404.1528(c), 416.928(c).

1  usual activities and responsibilities of daily living. [AR at 382.] As the ALJ should have also

2  considered the psychological tests in determining whether Dr. Blankenship's opinion was

3  supported by his clinical findings, the ALJ's stated reason for the rejection was not legally

4  sufficient.[16]   See Reddick, 157 F.3d at 723 (it is impermissible for the ALJ to develop an

5  evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony

6  and reports"); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (an ALJ may not reach a

7  conclusion and justify it by ignoring competent evidence in the record that would suggest an

8  opposite result).

9      Although the ALJ improperly discredited Dr. Blankenship's opinion, remand on this issue

10 is not warranted.  As noted above, the ALJ proffered a second hypothetical question that included

11 the limitations found by Dr. D'Ambrosio. [AR at 554-55.] Thereafter, the ALJ asked a third

12 hypothetical question which added further limitations to the second hypothetical question by

13 including the mental limitation findings of Dr. Blankenship. [AR at 555-56.] The vocational expert

14 replied that the hypothetical individual could still perform the work of a flagger. [AR at 556.] Thus,

15 plaintiff would have been found not disabled despite the ALJ's failure to accept all of the findings

16 from Dr. Blankenship.  As the outcome would have been the same, any error was therefore

17 harmless.  See Curry, 925 F.2d at 1131; Booz, 734 F.2d at 1380-81; Shramek, 226 F.3d at 814-

18 15.

19     Accordingly, plaintiff's argument regarding the ALJ's error in discounting the treating

20 psychologist's opinion is rejected.

21 /

22 /

23 /

24

25     [16]   Plaintiff briefly argues that the ALJ should have requested a medical expert to testify at the
26 hearing in regard to her possible somatoform disorder.  Joint Stip. at 16.  Specifically, Dr.
   Blankenship observed that plaintiff had an above-average score on the somatization scale. [AR
27 at 369, 399.] Plaintiff's contention is unavailing, as she bears the burden of proving that she is
   disabled.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999).  She has failed to offer any
28 objective evidence of additional limitations on her work capacity arising from this possible disorder.

**B.    THE ALJ'S ASSESSMENT OF PLAINTIFF'S CREDIBILITY**

During the hearing, plaintiff testified that she had pain in her hands, legs, hips, back, shoulders, and neck. [AR at 545-49.] She asserted that medication "calms" the pain but does not eliminate it. [AR at 548.] Plaintiff also stated that she suffered from symptoms of depression including crying spells, tiredness, and lack of interest in activities. [AR 550.] She testified that she could not work because of her physical pain and she "[could not] be around too much with people." [AR at 551.] She alleged that when the pain was worse, she became moody and frustrated, and could not concentrate. [Id.]

In his December 18, 2002, psychiatric consultative examination, Dr. Ernest Bagner summarized plaintiff's current level of functioning as follows: able to dress and bathe herself; able to do household chores, shop, and cook; fixes meals for her daughter and herself; takes her daughter to school and picks her up; does some household chores and then takes a nap; goes to the grocery store and buys small things because she cannot carry anything heavy; fixes meals for her daughter; and takes breaks during the day. [AR at 144.]

In rejecting plaintiff's subjective testimony, the ALJ stated, in pertinent part, the following:

> At the hearing, [plaintiff] explained how pretty much every part of her body experienced some sort of pain. [Plaintiff] did say that she had improved some since last year. [Plaintiff] stated during her December 18, 2002 psychiatric evaluation that she took care of the needs of her daughter. [Plaintiff] is able to cook, clean, take care of herself, and others.  By [plaintiff's] own admission she is not so disabled under Social Security [s]tandards as to prevent her from working.

[AR at 18.]

Plaintiff contends that the ALJ improperly rejected plaintiff's subjective allegations, and that the ability to perform the aforementioned activities does not necessarily mean that she was not disabled. Joint Stip. at 27.

Because plaintiff produced medical evidence of an underlying impairment that is reasonably likely to cause the alleged symptoms, medical findings are not required to support their alleged severity.  Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); see also Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("[B]ecause a claimant need not present clinical or diagnostic evidence to support the severity of his pain ... a finding that the claimant lacks credibility

1    cannot be premised wholly on a lack of medical support for the severity of his pain."); Byrnes v.

2    Shalala, 60 F.3d 639, 641-42 (9th Cir.1995) (applying Bunnell to subjective physical complaints).

3          The ALJ can reject plaintiff's allegations "only upon (1) finding evidence of malingering, or

4    (2) expressing clear and convincing reasons for doing so." Benton v. Barnhart, 331 F.3d 1030,

5    1040 (9th Cir. 2003).  The following factors may be considered in weighing a plaintiff's credibility:

6    (1) his reputation for truthfulness; (2) inconsistencies either in the plaintiff's testimony or between

7    the plaintiff's testimony and his conduct; (3) his daily activities; (4) his work record; and (5)

8    testimony from physicians and third parties concerning the nature, severity, and effect of the

9    symptoms of which he complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see

10   also 20 C.F.R. §§ 404.1529(c), 416.929(c). "General findings are insufficient." Reddick, 157 F.3d

11   at 722.  The ALJ must state which testimony is not credible and identify the evidence that

12   undermines the plaintiff's complaints. Id.; Benton, 331 F.3d at 1041.  If properly supported, the

13   ALJ's credibility determination is entitled to "great deference." Green v. Heckler, 803 F.2d 528,

14   532 (9th Cir. 1986).

15         Here, the ALJ failed to provide clear and convincing reasons for dismissing plaintiff's

16   subjective allegations.  First, plaintiff's statements regarding her activities of daily living suggested

17   that her activities were more limited than they have been portrayed by the ALJ. See Reddick, 157

18   F.3d at 722-23 (holding that the ALJ improperly discounted a claimant's subjective testimony when

19   the ALJ paraphrased the record inaccurately).  Specifically, the ALJ failed to note plaintiff's

20   assertions, made during the consultative examination, that she took naps and breaks during the

21   day, and did not purchase heavy items when shopping at the grocery store because she could not

22   carry them. [AR at 144.]  In addition, in the Daily Activities Questionnaire dated November 28,

23   2002, plaintiff asserted that her daughter sometimes prepared plaintiff's meals, her daughter

24   carried the heavy items when shopping, and she needed assistance in cleaning the house

25   because she could only do "light" cleaning. [AR at 105-06.]

26         Given the limited nature of plaintiff's activities of daily living, the ALJ has failed to show that

27   they supported the finding of nondisability. See Reddick, at 722 ("Only if the level of activity were

28   inconsistent with [c]laimant's claimed limitations would these activities have any bearing on

[c]laimant's credibility."). The ALJ's selective reliance on only a portion of the medical evidence was misleading, and did not serve as a clear and convincing reason for rejecting plaintiff's testimony. See id. at 723 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports").

Furthermore, at the hearing, the ALJ did not inquire into the amount of time plaintiff expended on these activities. As the record does not indicate that these activities consumed a substantial part of plaintiff's day, they were not reflective of plaintiff's ability to sustain gainful employment. See Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (stating that an ALJ may not discredit a claimant's allegations based on the inconsistency between her daily activities and her disability, where the activities do not take a substantial part of her day); cf. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("[I]f a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities."). The fact that plaintiff took care of her personal needs and her daughter's needs, including preparing meals and taking her daughter to school and picking her up, did not support the ALJ's decision that plaintiff could sustain gainful employment. [AR at 105, 144]; see Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (noting that a claimant is not required to be "utterly incapacitated" in order to be disabled and that "many home activities are not easily transferable to what may be the more grueling environment of the workplace").

Accordingly, the ALJ has failed to provide clear and convincing reasons for discrediting plaintiff's subjective allegations, and remand is warranted.

## C.   FULL AND FAIR HEARING

There is a presumption that administrative law judges are unbiased, which can be rebutted by showing a conflict of interest or some other specific reason for disqualification. Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001) (citing Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). However, it may be necessary to assign a different ALJ on remand, if the previous ALJ has been shown to be biased against a physician so that he could not fairly assess the

evidence.  See Reed v. Massanari, 270 F.3d 838, 845 (9th Cir. 2001) (assigning case to a different ALJ on remand where the ALJ denied the claimant's request for a consultative examination because the ALJ mistrusted, based on prior experience, the evaluations of the only specialists available to do the consultative examination).

In rejecting the treating physicians' opinions, the ALJ reasoned that the physicians were "all retained on a lien-fee basis, making their opinions suspect." [AR at 18.] Plaintiff argues that she was not given a fair hearing because the ALJ had a preconceived notion that doctors who provided reports on plaintiff's behalf for worker's compensation purposes were not truthful, unless proven otherwise.  Joint Stip. at 2-3.

As explained above, the Court acknowledges that the ALJ's comment that the treating physicians' assessments may be less reliable because they were retained on a lien-fee basis was not a legitimate reason for rejecting their opinions.  See Reddick, 157 F.3d at 725-26.  However, plaintiff has failed to show that the statement was tantamount to showing that the ALJ was so biased against plaintiff that he could not fairly assess the evidence.  See Reed, 270 F.3d at 845.  Here, the ALJ took into account the discrepancies between the treating physicians' opinions and the consultative examiners' opinions, and then concluded that the treating physicians were unreliable.  The ALJ merely provided a reason that failed to satisfy the proper legal standard for rejecting the doctors' findings.  But this does not show that the ALJ was incapable of providing a fair hearing.  See Bunnell v. Barnhart, 336 F.3d 1112, 1114 (9th Cir. 2003) (the "appearance of impropriety" standard for recusal in 28 U.S.C. § 445(a) does not apply to ALJs; rather, actual bias must be shown to disqualify an ALJ).

Accordingly, the Court denies plaintiff's request to remand on this ground.  In addition, plaintiff's request to remand the case to another ALJ is denied.

/

/

/

/

/

## VI.

## <u>REMAND FOR FURTHER PROCEEDINGS</u>

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision.  <u>See</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir.), <u>cert.</u> <u>denied</u>, 531 U.S. 1038 (2000); <u>Kail v. Heckler</u>, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate for the ALJ to properly consider plaintiff's subjective complaints.  The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.


DATED: December 14, 2006                                    _____
                                                                                    /S/
                                                                        PAUL L. ABRAMS
                                                           UNITED STATES MAGISTRATE JUDGE